**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LISA WILMOTH, individually; LISA WILMOTH and BO WILMOTH on behalf of their minor daughter EMILY WILMOTH,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | No. CV-05-1251-PHX-FJM<br><br>**ORDER** |

　　　This is an action under the Federal Tort Claims Act brought by the parents of Emily Wilmoth against the United States for medical negligence in the care and treatment of their daughter. Jurisdiction arises under 28 U.S.C. § 1346(b). The action was tried to the court without a jury under 28 U.S.C. § 2402. Congress waived the immunity of the United States under 28 U.S.C. § 2674. These are the court's findings and conclusions under Rule 52(a), Fed. R. Civ. P.

I

　　　Bo Wilmoth is a Staff Sergeant in the United States Air Force assigned to Luke Air Force Base. His wife Lisa gave birth to a healthy daughter, Emily, in January 2003. She progressed nicely and on August 29, 2003, Lieutenant Colonel Annette Gomez, a pediatric nurse practitioner at the Luke Clinic, noted that she was neurologically healthy. (Exhibit 3).

On October 21, 2003, Lisa Wilmoth called the Luke Clinic and told the clerk who answered the phone, Tracy Sloan, that Emily "was not using her legs for anything." (Exhibit 4). She added that Emily had been crawling and "then she stopped and won't use her legs for anything." *Id*. The clerk communicated this information to Carol Hokaj, a Luke nurse. She called Lisa, who told her that Emily had begun "to motivate around the floor, almost to crawling but not quite," but that about a month ago Emily "stopped using her legs as she had been," and that she did "not seem to have any weight bearing ability." *Id.* Nurse Hokaj advised Lisa that she should mention this at her next well-baby care checkup, scheduled nine days later on October 30, 2003. Nurse Hokaj checked this with Major Heather Gosnell, a Luke physician, and she agreed with the recommendation. *Id.*

On October 30, 2003, Lisa brought Emily in for her regularly scheduled nine month well-baby checkup at the Luke Clinic. She was seen by Captain Ann Buell, a Luke physician. The record indicates that Lisa told Dr. Buell that at six to seven months old, Emily had been crawling but that "now she was not crawling." She further advised that Emily would no longer support her weight on her legs, no longer used the lower half of her body and crawled only with her arms. (Exhibit 5). Dr. Buell examined her and noted that Emily was unable to sit well and crawled only with her upper body. The chart indicates that Emily stood on her legs for ten seconds and then "gave way." She assessed Emily as having "lower extremity hypertonia." *Id.*

Dr. Buell testified that she thought Emily was experiencing developmental delay or muscle disease. She decided to refer Emily to a neurologist. Dr. Gosnell agreed. Dr. Buell testified that there were three kinds of referrals in terms of timeliness. A "routine" referral might require four to six weeks. An "ASAP" referral might take one to two weeks. A "STAT" referral might take one to two days. Dr. Buell chose the "ASAP" referral because she was concerned but did not believe that the condition was acute. She testified that she did not consider the possibility of a neuroblastoma and did not believe that Emily was paralyzed at the time she saw her. She had both feeling and movement in her legs. Dr. Buell

1 acknowledged that she had been out of her residency program for only three months at the
2 time she saw Emily. She also thought that the Luke Clinic was understaffed.

3 Emily was seen by a neurologist at the Phoenix Children's Hospital on November 12,
4 2003, some thirteen days later. Lisa testified that between October 30 and November 12,
5 Emily's condition worsened and that she did not kick her legs.

6 On November 12, Dr. Deering, a neurologist at the Phoenix Children's Hospital,
7 examined Emily, noted that she had lost the ability to sit, found her to be paraplegic with
8 acute or subacute onset, and ordered an MRI. (Exhibit 6). The next day, November 13,
9 2003, the MRI showed a large, invasive, thoracic nueroblastoma. Dr. David Moss of the
10 Phoenix Children's Hospital removed the tumor from Emily's spine that day. He testified that
11 Emily's spine looked like a crescent after he removed the tumor. Emily was successfully
12 treated for her cancer, but is now a wheelchair-bound three year old paraplegic.

13 These basic facts are not in dispute. The conclusions to be drawn from these facts are.
14 The case presents the following issues: (1) whether the healthcare providers at the Luke Clinic
15 breached the relevant standard of care; (2) if they did, whether that breach caused Emily's
16 paraplegia; and, (3) if so, the amount of damages that should be recovered.

17 II

18 The Wilmoths contend that the healthcare providers at Luke breached the standard of
19 care on October 21, 2003 and October 30, 2003. They contend that on October 21, when
20 presenting with symptoms of the loss of the use of her legs, a medical emergency existed such
21 that Nurse Hokaj and Dr. Gosnell should have immediately referred Emily to a neurologist
22 for evaluation. They argue that the government's contention that Emily was presenting with
23 developmental delay symptoms is simply wrong because developmental delay exists only
24 when one is slow to develop skills. Here, Emily had skills and then lost them precipitously.

25 The government contends that Emily was presenting with developmental delay
26 symptoms on October 21, and that, in any event, Lisa told Nurse Hokaj that Emily had
27 stopped using her legs a month earlier. Thus there was no reason for Hokaj or Gosnell to
28 believe that there was an emergency. The government also argues that an invasive thoracic

- 3 -

1 neuroblastoma is so unusual that the failure to recognize it could not have breached the
2 standard of care. The Wilmoths reply that it was not the failure to recognize a rare
3 neuroblastoma that was the problem, but the failure to recognize that there was an immediate
4 neurological emergency of some kind.

5 At the outset, we note that both sides offered superb expert testimony from leaders in
6 their field, for which the court expresses its appreciation to all counsel. The very talented
7 experts had different views. As the fact finder, we resolve those differences against the
8 backdrop of plaintiffs' burden of proof by a preponderance of the evidence, which means that
9 plaintiffs must prove that it is more probably true than not true that there was a breach of the
10 standard of care.

11 Cleo Hardin, M.D., a board certified pediatrician, and professor of clinical pediatrics
12 at the University of Arizona Medical School, testified that Nurse Hokaj and Dr. Gosnell
13 breached the standard of care on October 21, when they were presented with a patient with
14 serious neurological problems and not developmental delay problems. She testified that one
15 does not acquire skills and then lose them. Emily should have been seen (1) *immediately* by
16 (2) a *physician*, who would have ordered an emergency MRI and a neurology consult.

17 Dr. Hardin also testified that Dr. Buell breached the standard of care on October 30,
18 2003, when she was presented with a focal neurological deficit. When a child loses function
19 and cannot sit, it is "bad," "ominous," and "alarming." She testified that it was below the
20 standard of care to wait twelve or thirteen days when confronted by a neurological emergency.
21 There should have been an emergency MRI and neurological consult ordered.

22 In contrast, James Padrez, M.D., a board certified pediatrician, testified on behalf of
23 the United States that the Luke healthcare providers did not breach the standard of care on
24 either day. He believed that the October 21 presentation was not an emergency because Emily
25 had had symptoms for one month. And he testified that the October 30 presentation
26 warranted the neurological referral that Dr. Buell ordered (one to two weeks) because there
27 was no emergency. On cross-examination, in contrast to Dr. Hardin, Dr. Padrez
28 acknowledged that he had been a defense standard of care expert witness in at least six cases.

1  He was also of the view that given the number of patients a physician has, one must
2  "surrender to the practical aspects of the case."  In short, his view would vary the standard of
3  care as a function of the number of patients a physician sees.

4  The government also called George Jallo, M.D., a professor of pediatric neurosurgery
5  at Johns Hopkins University.  He specializes in brainstem and spinal cord tumors and claims
6  that he removes forty of the one hundred or so done nationally each year.  Although he
7  disagreed with Dr. Hardin, he testified chiefly about causation, rather than standard of care.

8  Based on all the evidence (not just that related here), we find that the Wilmoths have
9  met their burden of proving that it is more probable than not that the Luke healthcare
10 providers breached the relevant standard of care on both October 21 and October 30, 2003.
11 We reject Dr. Padrez' opinion that a physician must "surrender" to the practical aspects of
12 case management, and that when there are lots of patients, one does what one can. When any
13 entity agrees to provide healthcare, it is obligated to meet the standard of care.

14 In contrast, Dr. Hardin's views were highly persuasive.  Even to a layperson (such as
15 this judge), common sense  suggests that when a mother tells a healthcare provider that her
16 child had been crawling, stopped, and could no longer use her legs, there is a big and
17 immediate problem.  Dr. Gosnell breached the standard of care by not immediately seeing
18 Emily on October 21.  That she did not see Emily that day because Emily "was not her
19 patient" is itself evidence of breach.  Nurse Hokaj called *her*. Air Force personnel and their
20 dependants are captives of the healthcare system provided to them.  The Air Force thus has
21 an obligation to provide the necessary care warranted by the standard of care.

22 We also find that the Wilmoths met their burden of showing that it is more probable
23 than not that Dr. Buell breached the standard of care on October 30, 2003 by selecting a one
24 to two week referral to a neurologist rather than an immediate referral.  The Luke Clinic had
25 no neurologist on staff and no MRI.  Emily should have been immediately rushed to an
26 outside neurologist.  We acknowledge that Dr. Buell was new to her job, believed that the
27 clinic was understaffed, and had some uncertainty about the  bureaucratic hurdles associated
28 with an outside referral.  We also acknowledge that neuroblastomas of the spine are relatively

- 5 -

1  rare and thus it was not a breach not to suspect a neuroblastoma. But it was a breach not to
2  recognize an immediate neurological problem of *some kind* which needed immediate attention
3  given their catastrophic potential. Although we heard a substantial amount of evidence, we
4  agree with Dr. Hardin that Exhibits 4 and 5 (the Clinic's notes of October 21 and October 30),
5  powerfully support plaintiffs' claims.

## III

7   Although we have found that the government's healthcare providers breached the
8  standard of care, they will not be liable unless plaintiffs also prove causation. The Wilmoths
9  contend that had Emily received appropriate care shortly after October 21 or after October 30,
10 she would not be a paraplegic. The government contends that Emily was a paraplegic before
11 October 21, and thus even though the standard may have been breached, there is no liability.
12  Lisa Wilmoth testified that, as of October 30, Emily was still kicking and moving her
13 legs. Dr. Gosnell testified that she thought that Emily was presenting with developmental
14 delay issues on October 21 and on October 30, and that she was not paralyzed. Dr. Buell
15 testified that she also was thinking of developmental delay when she saw Emily on October
16 30. In the alternative, she thought it might have been a muscle disease. She did not order a
17 "STAT" referral because she did not believe it was an acute issue. She said that Emily had
18 movement in her legs on October 30. Dr. Buell did not believe she was paralyzed at that time.
19  Dr. Dinesh Talwar, a pediatric neurologist, testified on behalf of the Wilmoths that
20 Emily's outcome would have been better if the surgery had occurred on October 21. He also
21 expressed the opinion that because Emily still had leg function on October 30, the outcome
22 would have been better on that day too. It was his opinion that Emily was not paralyzed on
23 these two days. He thought the point of no return had been reached some time between
24 October 30 and November 12.
25  Dr. Jallo (already discussed above in Part II), testified that neuroblastomas are
26 insidious and indolent. Typically, children cannot complain until it is too late. Fewer than
27 5% of the neuroblastomas end up in the spine. Most of them occur in the abdomen. He
28 testified that if somebody is walking one day and then stops, the surgery must be done that

1  day, or inside a twenty-four to forty-eight hour window, or else there would be no recovery.
2  He was of the opinion that surgery on October 21 and October 30 would have made no
3  difference because he believed that Emily had been paralyzed two months earlier. Based
4  upon Exhibit 4, (the notes of October 21), he believed that Emily was paralyzed by September
5  21, 2003.

6  The defense also called Louis Dehner, M.D., a professor of pathology at the St. Louis
7  University Medical School. It was his opinion that Emily's spinal column was transected in
8  mid-September. He based this on pathology reports that showed the tumor to be slow
9  growing. [1]

10  The defense also called Katherine Matthay, M.D., a professor of pediatrics at the
11  University of California at San Francisco. She was a very impressive witness, who does
12  research on neuroblastomas. She says they are insidious and grow long before there are
13  symptoms. She thought Emily was probably paralyzed on October 21, although it was
14  impossible to tell without an examination. She thought it was unlikely that surgery on
15  October 21 would have helped, because she believed Emily was paralyzed in September. She
16  also believed that Emily was paralyzed on October 30, because she could not sit.

17  In rebuttal, the Wilmoths called Susan Cohn, M.D. , a professor of pediatrics at the
18  Northwestern University Medical School in Chicago. She, too, is a pediatric oncologist and
19  is a colleague of Dr. Matthay. She disagreed with Dr. Matthay, Dr. Jallo, and Dr. Dehner
20  because she believes that Dr. Buell's testimony and the medical records do not support the
21  view that Emily was paralyzed by October 21. She noted that just because one cannot bear
22  weight on one's legs does not mean one is paralyzed. She said loss of weight bearing ability
23  and loss of movement are different phenomena. She explained how one could move one's legs
24  while lying down, even though one might be incapable of standing. She believed that the
25  notes of October 30 (Exhibit 5), showed weakness but no indication of paralysis, and added

---

28  [1] For this same reason her prognosis for surviving the cancer is very high.

that Dr. Buell said the child was moving her legs. Dr. Cohn said she has even seen patients recover from their paralysis.

Based on all of the evidence (not just that related here), although closer than the question of breach, I find that the Wilmoths have proved that it is more probable than not that the defendants' breach of the standard of care caused Emily's paraplegia. Neither Dr. Gosnell nor Dr. Buell (who actually examined her on October 30), believed that Emily was paralyzed on October 21 or October 30. While Dr. Buell made the wrong choice in not ordering an immediate referral, there is no reason to doubt her physical observations of Emily. I find that Dr. Buell's physical examination of Emily on October 30 is the best evidence of Emily's condition on that day.

To be sure, the defense experts were impressive, and it is entirely possible that the damage was done before October 21. But their opinions are drawn from their evaluation of the record. Dr. Buell was the only physician who examined Emily on October 30, and she concluded that Emily was not paralyzed. Nor is there anything in the record of October 30 (Exhibit 5), that would indicate that Dr. Buell thought she was paralyzed. Moreover, I agree with Dr. Cohn's observation that loss of weight bearing ability and loss of movement are two different things.

IV

The Wilmoths seek damages for Emily's future medical expenses in the amount of $2,000,000.00, which they would put in a reversionary trust such that unneeded and unused funds would be returned to the United States. They also seek $688,000.00 for Emily's lost future earnings. They seek $20,000,000.00 for the pain and suffering that Emily has and will endure. Finally, Lisa Wilmoth seeks $500,000.00 on her own behalf for loss of consortium.

The United States contends that as long as Bo Wilmoth stays in the Air Force, Emily is likely to have no future medical expenses until she reaches the age of twenty-one. In addition, the United States points out that many of the claimed elements of future medical expenses would have been incurred even if Emily had not been made a paraplegic. Examples

1 of these are motor vehicles and telephones. The United States contends that Emily's future
2 medical expenses would not exceed $921,000.00.

3     There is, of course, no way to predict with any accuracy Emily's future medical
4 expenses. If the Air Force does not discharge her father, many of her expenses in the short
5 term will be covered. On the other hand, her father may be discharged. Moreover, she will
6 have medical expenses after she is twenty-one whether her father stays in the Air Force or not.

7     It is apparent from the economic and vocational experts called on the question of
8 damages that opinions in this area are educated guesses, based upon unknowable future
9 contingencies. Reduced to present value, the plaintiffs' educated guess is $2,000,000.00 and
10 the defendant's educated guess is about $1,000,000.00. We suspect Emily's future medical
11 expenses are likely to be somewhere between these figures. Accordingly, we find it more
12 probable than not that Emily's future medical expenses caused by the paraplegia will be
13 $1,500,000.00.

14     We turn next to lost earning capacity. The Wilmoths originally sought $1,500,000.00
15 for lost earning capacity but at the close of the case sought $688,000.00. This was based upon
16 a realization that there is every good reason to think that Emily will be employed in the field
17 of her choice. Emily has average to above average intelligence. There is no reason why she
18 cannot graduate from high school and go to college.

19     It is true, however, that Emily will not be employable in certain areas because of her
20 paraplegia. She will have to select relatively sedentary work (like judging), but it is to be
21 noted that relatively sedentary work can sometimes pay more than manual labor.

22     While we have every reason to believe that Emily will succeed in school and be
23 employed at the level of her fullest abilities, she is entitled to compensation for lost
24 employment opportunities because of her paraplegia. We find that a fair and reasonable
25 assessment for this element of damages is $500,000.00.

26     The Wilmoths seek $20,000,000.00 for Emily's pain and suffering. No evidence has
27 been offered to support such a large figure. It is a weakness in American law that there are
28 no standards for the assessment of pain and suffering in tort cases. We typically tell juries that

1 their awards must be based upon the evidence and not upon speculation, guesswork, or
2 conjecture.  *See, e.g., Manual of Model Civil Jury Instructions for the Ninth Circuit*,
3 Instruction 7.1 (2001).  There is no question that there is pain and suffering as a result of
4 paraplegia.  Yet there is no way to reasonably quantify the value of that pain and suffering
5 except through judgment guided by common sense.  At age three, Emily is likely to live for
6 at least another seventy years.  It is thus reasonably probable that Emily will suffer the pain
7 and discomfort of being wheelchair-bound for at least seventy years.  With due consideration
8 to an annual amount for such pain and discomfort, and considering a reduction for present
9 value, we find that a fair and reasonable amount as compensation for pain, suffering and
10 discomfort caused by Emily's paraplegia is $1,500,000.00.

11 Finally, Lisa Wilmoth claims loss of consortium with Emily in the amount of
12 $500,000.00. Bo makes no such claim. It sounds like they have reached agreement that Lisa
13 will be Emily's primary caretaker during her years of minority. Consortium, like pain and
14 suffering, is difficult to evaluate.  We do not believe that Lisa is going to lose the love,
15 affection, and companionship of Emily.  If anything, the injury is likely to strengthen these
16 elements. On the other hand, there will be some loss of enjoyment of life and activities
17 together as a result of Emily's paraplegia.  We have only judgment informed by common
18 sense in this area.  We believe that $200,000.00 would be a fair and reasonable amount to
19 compensate Lisa individually.

20 <center>V</center>

21 We therefore find in favor of Lisa Wilmoth and Bo Wilmoth on behalf of their minor
22 daughter, Emily Wilmoth, and against the United States in the total amount of $3,500,000.00.
23 We further find in favor of Lisa Wilmoth, individually, and against the United States in the
24 amount of $200,000.00.

25 We understand that the parties have agreed to place the amounts on Emily's behalf in
26 trust, and that some of that will be in a reversionary trust. We thus invite the parties to lodge
27 with the court an appropriate form of final judgment that will be consistent with this order and
28 their agreement.

1  We again thank Mr. Larry Eiser, Mr. Paul Levine and Mr. Eric Webb for their
2  excellent lawyering and professionalism throughout the trial.
3  DATED this 19th day of January, 2007.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge